**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| SEAN O.,[1]<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 25-CV-3045-CJW-KEM<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Sean O. seeks judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Plaintiff argues that the administrative law judge (ALJ), John Priester, erred in evaluating the opinion of his treating psychiatric nurse practitioner and in evaluating his subjective complaints, specifically his testimony that he could not stand for six to eight hours a day. I recommend **affirming** the ALJ's decision.

## *I. BACKGROUND*

Plaintiff was born in 1971 and worked as a certified nursing assistant (CNA) at nursing homes from 2009 to 2022, moving patients around (heavy work). AR[2] 23, 38, 223, 266, 3201. Plaintiff suffers from depression and anxiety related to his bipolar

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] AR refers to the Administrative Record in this case (Doc. 7).

disorder, and since at least 2015, he has seen psychiatric nurse practitioner Shelby Allen-Benitz for medication management, as well as attended therapy. *See* AR 2202, 3643. A few treatment notes (as early as 2015) mention Plaintiff's use of the Family Medical Leave Act (FMLA) at work due to his mental health and inability to handle work stress. AR 2215-16, 2295, 2297, 2339, 2369, 2373, 3646; *see also* AR 2321. Plaintiff is a recovering addict who relapsed in 2015 (alcoholism and opioid abuse) and attempted suicide; he went to rehab and has been sober since that time. *See* AR 3641, 3643.

In January 2022, Plaintiff's long-term relationship with his live-in girlfriend became rocky. *See* AR 2151, 2190-92. They ultimately broke up, and Plaintiff moved into his own apartment in April 2022. *Id.* Due to his relationship issues, Plaintiff suffered increased depression and struggled to get out of bed and to work. AR 2157-58, 2187-89. In early June 2022, his work's Human Resources (HR) team met with him about his absences and use of FMLA leave. *Id.* On June 25, 2022, Plaintiff attempted suicide and overdosed on his medications. AR 2024, 2027, 2073, 2184-85. A few days later, he was admitted to the hospital under a court-ordered commitment and remained hospitalized until July 6, 2022. *Id.* He lost his job during this time due to absenteeism. *Id.*

In late September 2022, Plaintiff started a new part-time job, working five hours a day, five days a week as a cashier at a large retail store. AR 52-53, 266, 346, 3146. He later reported working only twenty hours a week (with five-hour shifts). *Id.* Plaintiff continued to see NP Allen-Benitz for psychiatric treatment and various therapists, including one specifically targeted to gambling addiction. In March 2023, he applied for disability benefits, alleging an onset date of June 2, 2022. AR 13. In April 2023, he lost all his belongings and a beloved pet cat in an apartment fire. *See* AR 2981. He reconciled with his girlfriend sometime thereafter. *See* AR 2974, 3442, 3446.

Plaintiff alleged disability based on bipolar disorder, substance abuse in remission, deep vein thrombosis, right shoulder rotator cuff tear, migraines, lumbar arthritis,

depression, anxiety, post-traumatic stress disorder (PTSD), and left knee pain post-knee replacement. AR 64. The Social Security Administration denied Plaintiff's request for benefits on initial review in November 2023 and on reconsideration in January 2024. AR 63-85. As part of those reviews, state agency medical consultants Michael Sutcliffe, DO, and Mary Greenfield, MD, and psychological consultants Jonathan Brandon, PhD, and Jennifer Wigton, PhD, reviewed treatment records and provided medical opinions on Plaintiff's RFC. AR 68-71, 79-83. Plaintiff requested further review.

The ALJ held a hearing in July 2024, at which Plaintiff and a vocational expert (VE) testified. AR 32-33. The ALJ issued a written opinion on August 9, 2024, following the five-step process outlined in the regulations[3] to determine whether Plaintiff was disabled. AR 13-25. The ALJ found Plaintiff suffered from severe impairments of anxiety and obsessive-compulsive disorders; depressive, bipolar, and related disorders; trauma and stress-related disorders; and osteoarthritis and allied disorders. AR 15-16. To aid in steps four and five, the ALJ determined Plaintiff had the residual functional capacity (RFC)[4] to perform light work[5] with the following additional limitations:

> [T]he claimant can only occasionally reach overhead to the right; can frequently climb ramps and stairs; occasionally climb ladders, ropes or

---

[3] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." ***Grindley v. Kijakazi***, 9 F.4th 622, 628 (8th Cir. 2021) (quoting ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. § 404.1520(a)(4)**. The claimant bears the burden of persuasion to prove disability. ***Goff***, 421 F.3d at 790.

[4] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019).

[5] Light work requires the ability to lift and carry ten pounds frequently and twenty pounds occasionally, and to stand, walk, and sit (with normal breaks) for a total of about six hours in an eight-hour workday. **20 C.F.R. § 404.1567(b)**; **SSR 83-10**, 1983 WL 31251, at *5-6 (Jan. 1, 1983); *see also, e.g.*, **SSR 96-9p**, 61 Fed. Reg. 34478, 34480 (July 2, 1996).

> scaffolds; occasionally stoop, kneel, crouch, and crawl; and the claimant is able to perform simple tasks.

AR 18. In determining Plaintiff's RFC, the ALJ considered the medical opinions in the record, including from NP Allen-Benitz, which the ALJ found unpersuasive. AR 22. Based on VE testimony, the ALJ concluded Plaintiff could not return to his past CNA work, but Plaintiff could perform a significant number of other jobs in the national economy, including cleaner, routing clerk, and cashier. AR 24. Thus, the ALJ found Plaintiff not disabled from June 2, 2022, through August 9, 2024, the date of the decision. AR 24-25.

The Appeals Council denied Plaintiff's request for review on June 18, 2025 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[6] Plaintiff filed a timely complaint in this court (Docs. 1, 4).[7] The parties briefed the issues (Docs. 11-13) and the Honorable C.J. Williams, Chief District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## *II. DISCUSSION*

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[8] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[9] The court "do[es] not reweigh the evidence or review the factual record de novo."[10] If, after reviewing the evidence, "it is possible to draw two inconsistent

---

[6] *See* **20 C.F.R. § 404.981**.

[7] *See* **20 C.F.R. § 422.210(c)**.

[8] ***Grindley***, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[9] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007).

[10] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[11]

Plaintiff challenges the ALJ's evaluation of the opinion of his treating psychiatric provider, NP Allen-Benitz. Plaintiff also challenges the ALJ's finding that he could stand for six hours in an eight-hour day (failing to obtain functional limitations from a consultative examiner and rejecting Plaintiff's subjective complaints), as well as generally challenging the ALJ's evaluation of his subjective complaints.

### *A. Treating Psychiatric Provider Opinion*

For claims filed after March 2017 (like Plaintiff's), the ALJ must "evaluate the persuasiveness of medical opinions" by considering certain factors and "explain how [the ALJ] considered the supportability and consistency factors."[12] Here, NP Allen-Benitz completed a form in March 2023,[13] opining that Plaintiff would be unable to meet competitive standards in several categories, including maintaining regular attendance and punctuality, working near others without being distracted by them, performing at a consistent pace without an unreasonable number of rest periods, and dealing with normal work stress. AR 2896-900. She also indicated he would miss more than four days of work a month. *Id.* NP Allen-Benitz explained that "[d]istress tolerance has historically been problematic for [Plaintiff], leading to absence from previous jobs requiring FMLA paperwork completion by this writer on multiple occasions," and that "work is a significant source of stress for [Plaintiff]," with him often complaining about supervisors, coworkers, and how agencies are run. *Id.*

The ALJ found NP Allen-Benitz's opinion unpersuasive, stating:

---

[11] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

[12] **20 C.F.R. § 404.1520c**.

[13] NP Allen-Benitz also submitted this same opinion in narrative form, dated April 24, 2024. AR 3663-64.

> [The opinion] is not supported by [NP] Allen-Benitz'[s] treatment notes. For example, although some abnormal mental status findings were noted with respect to mood, affect, and psychomotor agitation at times, her treatment notes also reflect essentially normal findings with respect to concentration, memory, orientation, thought processes, thought content, and intelligence. Moreover, the opinion is inconsistent with the record as a whole, including with other findings of record that he was oriented to time, place, and person, and he had normal mood and memory. The opinion is further inconsistent with the [opinions of the] State agency psychological consultants . . . .

AR 22. Plaintiff argues that the ALJ did not properly evaluate the supportability factor. Plaintiff asserts the ALJ ignored the reasons given by NP Allen-Benitz for her opinion, namely, Plaintiff's need for FMLA leave while working as a CNA.

The regulations define "supportability" as "the objective medical evidence and supporting explanations presented by a medical source . . . to support" her opinion.[14] For consistency, the regulations state "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion[] . . . will be."[15] Plaintiff cites district court cases outside of the Eighth Circuit that have held supportability requires the ALJ to acknowledge and discuss a source's given reasons for their opined limitations. The reasoning—and interpretation of the regulation definitions—has varied. One court held that "the regulations define supportability for a medical source opinion as having two components: objective medical evidence and the medical source's explanations."[16] This court suggested that "consistency" focused on the opinion's consistency with the limitations contained in other medical opinions.[17] Another court held that supportability requires the

---

[14] **20 C.F.R. § 404.1520c(c)(1)**.

[15] ***Id.*** § **404.1520c(c)(2)**.

[16] ***Balotti v. Comm'r of Soc. Sec.***, 605 F. Supp. 3d 610, 618 (S.D.N.Y. 2022).

[17] ***Id.*** at 621.

ALJ to "consider the supporting explanations" or "objective medical evidence" "contained" in the opinion; this court held that the source's treatment "notes bear on consistency, not supportability, [when] they are not referenced in [the source's] opinion."[18] Yet another of Plaintiff's cited cases suggested that supportability was "geared toward assessing how well a medical source supported and explained their opinion," while "'consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, not just what a medical source had available to them.'"[19] Some of Plaintiff's cited cases are distinguishable on their facts,[20] but others are not and support remand here.[21]

I do not find these cases persuasive. In adopting the new regulations on analyzing medical opinions, the Social Security Administration provided guidance on the supportability and consistency factors, stating:

> [Supportability is t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's

[18] ***Minarsky v. Kijakazi***, 747 F. Supp. 3d 801, 815 (M.D. Pa. 2024).

[19] ***Daniels v. Kijakazi***, 617 F. Supp. 3d 180, 189 (S.D.N.Y. 2022) (quoting ***Acosta Cuevas v. Comm'r of Soc. Sec.***, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2022 WL 717612 (Mar. 10, 2022)).

[20] *See, e.g.*, ***Hammond v. O'Malley***, 735 F. Supp. 3d 567, 583 (E.D. Pa. May 29, 2024) (ALJ did not properly analyze supportability factor when ALJ relied on normal objective examinations from another provider "to the exclusion of any serious treatment of Plaintiff's bizarre and, in some instances, limiting fantasies and illusions," which "amounts to improper cherry-picking," as well as failed to mention "the reasons given by [the source] for her opinion").

[21] *See* ***Minarsky***, 747 F. Supp. 3d at 815 (rejecting argument "that the ALJ considered supportability by analyzing [the source's] treatment notes . . . . [b]ecause those treatment notes are not referenced in [the source's] opinion" and therefore "have no bearing on whether the opinion was supported by 'objective medical evidence and supporting explanations'"); ***Joshua H. v. Bisignano***, No. 23-cv-3431, 2025 WL 1527464, at *6 (D.N.J. May 29, 2025) (holding that ALJ did not "properly consider[] the supportability factor" when ALJ stated the opinion "was not supported by the" treatment notes, including from the source, which included normal mental status examinations, without mentioning the "signs and symptoms" the source indicated supported her opinion, such as anhedonia, decreased energy, and unstable interpersonal relationships).

> supporting explanation . . . [,] and [consistency is] the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim . . . . A medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, will not be persuasive regardless of who made the medical opinion. . . . [T]he supportability and consistency factors . . . generally include[] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion . . . is with other evidence in the claim.[22]

This language suggests that supportability includes both consideration of the objective evidence in the source's treatment records ("the objective medical evidence") and the source's explanation for the opinion ("the supporting explanations"), while consistency involves analyzing the record as a whole (evidence from other sources). In addition, the Social Security guidance also states that the new supportability and consistency factors are the same as under the old treating-source rule,[23] which defined supportability as follows:

> The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions.[24]

(The old rule defined consistency as "consisten[cy] . . . with the record as a whole.")[25]

Thus, although the reasons a source provides for her opinion are part of supportability, so too is an analysis of the objective medical evidence in the source's

---

[22] *Revisions to Rules Regarding the Evaluation of Medical Evidence*, **82 Fed. Reg. 5844**, 5853-54, 5859 (Jan. 18, 2017).

[23] ***Id.*** at 5853.

[24] **20 C.F.R. § 404.1527(c)(3), (4)**.

[25] ***Id.***

treatment notes. Here, the ALJ discussed the latter but not the former. The ALJ found NP Allen-Benitz's relatively normal mental status examinations in her treatment notes did not support the severe limitations in her medical opinion. AR 22. The ALJ did not discuss Plaintiff's need for FMLA leave when working as a CNA, one of the reasons given by NP Allen-Benitz for her opinion.

The Eighth Circuit has twice held that the ALJ adequately explained supportability by discussing inconsistencies between the opinion and the "provider's own examination notes."[26] The Eighth Circuit favorably cited[27] an Eastern District of Missouri case in which the court collected cases and held "[i]n articulating how they considered the supportability factor, ALJs may note that the physician's own treatment notes do not support the physician's opinion, that the physician's opinion stems from a checklist, that the physician did not consider certain evidence, did not examine the claimant, or did or did not provide a detailed explanation for [the] opinion."[28] In addition, at least two district courts in this circuit have rejected Plaintiff's precise argument here, that an ALJ errs "by relying on [a source's] treatment records rather than the explanations provided in her medical opinion" in analyzing supportability, reasoning that an ALJ is "not

[26] ***Cropper v. Dudek***, 136 F.4th 809, 815 (8th Cir. 2025) (rejecting argument that ALJ erred by "offering no explanation as to how [source's] opinions were not supported" when ALJ "discussed [source's] treatment notes in detail, explaining those notes included relatively intact mental status examination observations, reported [claimant] consistently doing 'alright,' and highlighted [claimant's] personal activities such as fishing, seeing friends, playing cards, and taking trips" (cleaned up)); *see also* ***Bowers v. Kijakazi***, 40 F.4th 872, 875 (8th Cir. 2022) (upholding ALJ's finding that source's opinion was not persuasive when ALJ found the "opinion was not supported by the objective medical evidence" based on source's "routinely normal" examinations, advice to exercise, and routine and conservative treatment). In neither *Cropper* nor *Bowers* did the claimant specifically argue error based on the ALJ's failure to address the source's "supporting explanations," instead challenging supportability more generally.

[27] *See* ***Cropper***, 136 F.4th at 815.

[28] ***Starman v. Kijakazi***, No. 20-cv-00035, 2021 WL 4459729, at *4 (E.D. Mo. Sept. 29, 2021) (citations omitted).

required to address [every] part of [a] medical opinion."[29] Accordingly, I recommend finding that the ALJ adequately articulated the supportability of NP Allen-Benitz's medical opinion by discussing "the objective medical evidence" underlying NP-Benitz's opinion, rather than the "supporting explanations presented by" NP Allen-Benitz.

To the extent Plaintiff argues that the ALJ erred in finding NP Allen-Benitz's treatment notes do not support her opinion, the Eighth Circuit has held that an ALJ's supportability analysis is not subject to substantial-evidence review.[30] Plaintiff suggests that his ever-changing medication adjustments,[31] near-weekly therapy, and FMLA use support NP Allen-Benitz's opinion that he would miss more than four days of work a

---

[29] ***Justin V. v. Bisignano***, No. 24-CV-1248, 2025 WL 2495056, at *4 (E.D. Mo. Aug. 29, 2025); *see also* ***Cynthia J. v. Bisignano***, No. 24CV253, 2025 WL 2445816, at *23-24 (D. Neb. Aug. 6, 2025), *report and recommendation adopted,* 2025 WL 2443727 (Aug. 25, 2025) (clear error review).

[30] *See* ***Cropper***, 136 F.4th at 814-15 (holding that a plaintiff may challenge whether "the ALJ's ultimate persuasiveness and residual functional capacity findings are supported by substantial evidence," but not whether "the ALJ's supportability explanation and finding [a]re . . . supported by substantial evidence").

[31] In August 2021, February 2022, and early June 2022 (prior to the alleged onset date), NP Allen-Benitz continued Plaintiff's medications (150 mg Seroquel (quetiapine); 1500 mg Depakote; 40 mg citalopram). AR 2187-94. His medications were adjusted by the hospital after his suicide attempt (he stopped Depakote and started Zyprexa (olanzapine)), and at his follow-up appointment with NP Allen-Benitz in July 2022 she stopped Zyprexa, increased his Seroquel dosage (to 300 mg), and continued citalopram. AR 2184-85. In August 2022, she replaced Seroquel with Latuda (40 mg) and started trazodone (150 mg) (continuing citalopram). AR 2181-82. Over subsequent appointments, she increased the Latuda dosage (to 60 mg, then 80 mg). AR 2180, 2993. After Plaintiff lost his cat and possessions in an apartment fire in April 2023, NP Allen-Benitz added lamotrigine, which Plaintiff stopped due to a side effect (rash). AR 2964, 2981. Medications were continued at the next few appointments (Latuda, trazodone, citalopram). AR 2972, 3233. He briefly trialed decreasing trazodone due to sleep interruptions but quickly returned to his normal dosage. AR 3456, 3465, 3473. He trialed replacing citalopram with Wellbutrin (bupropion) and then Trintellix but ultimately returned to citalopram. AR 3462, 3612, 3620. He increased his trazodone dosage (to 200 mg) and added Buspar (buspirone), adjusting the dosage at each subsequent appointment (first 10 mg three times a day, then 15 mg three times a day, then two times daily with the third dose as needed). AR 3616, 3677, 3899.

month. He argues that the ALJ erred in relying on his "relatively normal [mental status examinations] while avoiding stressors and only performing part-time work where the employer was liberal in allowance for absences." Doc. 11. NP Allen-Benitz's treatment records do not reflect that Plaintiff needed unscheduled absences for his cashier work, though. Prior to the alleged onset date, therapy notes from Plaintiff's 2015 suicide attempt and relapse from sobriety reflect that Plaintiff "believes he has been fired from his job since his FMLA has run out and he hasn't returned to work yet." AR 3646. In October 2017, Plaintiff reported increased stress from having to work as a CNA more days in a row than he felt capable of, suffering migraines, and needing time to decompress at home; NP Allen-Benitz wrote him a note indicating he could not work four days in a row. AR 2215-16, 2456-58. In late March 2019, he reported feeling overwhelmed, crying at work, and worrying about a potential breakdown like two years earlier, and HR coordinated a few days off for him, which he used to relax and meditate. AR 2295, 2297. In October 2019, he noted the attendance policy at his job had changed and he would need intermittent FMLA leave as a result; he reported feeling anxiety about the FMLA process. AR 2339. In late February 2020, he complained about a terrible night at work where they were short-staffed and a nurse yelled at him; he later reported he took a day off due to the "high emotions" of that night, recuperating with sleep and watching a movie at home, and he noted he was thinking about finding a new job due to the high stress. AR 2369, 2373. In early June 2022, Plaintiff told NP Allen-Benitz he was suffering from increased depression due to his breakup and struggling to get out of bed, and he noted HR had spoken to him about his FMLA usage; NP Allen-Benitz noted she updated his FMLA paperwork and sent it to his employer. AR 2187-89. After his suicide attempt and hospitalization in late June 2022, Plaintiff was fired from his CNA job due to missing too much work. AR 2166. The only mention of Plaintiff using FMLA leave or otherwise missing work for his cashier job is in February 2023, when Plaintiff "reported increased depression within the context of a shoulder injury causing increased

pain and sleep disturbance," and NP Allen-Benitz noted Plaintiff "[h]ad to take time off" and "needed [her] to complete FMLA paperwork." AR 2984, 2993. Plaintiff testified at the hearing in July 2024 that he could not work more than 20 hours a week due to difficulties leaving his apartment, which started after his apartment fire in April 2023 (four 5-hour shifts); that his depression made it difficult for him to leave the house on some days, and his employer tolerated his absences and had HR work with him; that he had been missing work two to four times a month lately and received one "purple warning"; and that he used FMLA leave when he worked as a CNA so that he could call in without it counting against his attendance. AR 37-40, 46. Based on this record, substantial evidence supports the ALJ's finding unpersuasive NP Allen-Benitz's opinion that Plaintiff would miss work *more* than four times a month.

I recommend finding that the ALJ did not err in evaluating NP Allen-Benitz's medical opinion.[32]

### *B. Failure to Develop the Record and Subjective Complaints*

Plaintiff argues "the record is lacking in terms of an examining opinion concerning [Plaintiff's] physical limitations due to the consultative examiner's failure to opine as to how [Plaintiff] would be physically limited in his report," and the ALJ should have further developed the record. Doc. 11. Plaintiff alleged disability based on physical conditions that included deep vein thrombosis, right shoulder rotator cuff tear, lumbar

---

[32] To the extent Plaintiff argues in passing that no medical-opinion evidence supports the ALJ's mental RFC determination, the Eighth Circuit recently rejected that the RFC determination must be supported by a "medical opinion . . . that sp[eaks] to the claimant's ability to function in the workplace," as opposed to "medical evidence" such as treatment records (that is not "functional in-and-of-itself)." ***Bonham v. Bisignano***, 177 F.4th 934, 941-42 (8th Cir. 2026). In any event, here, the ALJ's mental RFC determination is supported by the opinions of the state agency psychological consultants. ***See*** AR 18 (ALJ found claimant could "perform simple tasks"); AR 71, 83 (state agency consultants found "the claimant retains the mental capacity to perform moderately complex tasks on a consistent basis in a full-time work setting.").

arthritis, and left knee pain post knee replacement. AR 64. His June 2023 function report to the Social Security Administration largely reflected mental limitations, although he did report issues with bending, kneeling, and stair climbing due to knee pain. AR 281-88. He did not check that he had issues squatting, reaching, sitting, standing, or walking, but said he would only be able to walk a "a couple blocks" before needing to rest for five to ten minutes. *Id.* He reported being able to clean, do laundry, shop in stores for household items and groceries, go out to eat, play cards, and go to the doctor's office. *Id.* His girlfriend also reported that he only suffered from mental limitations and indicated that they ate dinner together, played cards, went on walks, and watched television. AR 289-96. She submitted a letter in June 2024 that also focused on Plaintiff's mental limitations. AR 349-50.

Prior to the Social Security Administration's initial denial of his request for benefits, Plaintiff underwent a consultative examination in September 2023 with Brian Allen, DO. AR 3430-33. Plaintiff told Dr. Allen he could sit for two hours, stand for two hours, walk two blocks, and had difficulties reaching high with his right arm, lifting, carrying, and climbing stairs. *Id.* Dr. Allen performed an objective examination and recorded his range-of-motion findings (he observed tenderness to palpation and limited range of motion of the lumbar spine and right shoulder, as well as limited range of motion of the left knee). *Id.* Dr. Allen did not opine as to Plaintiff's functional abilities, for example, how long Dr. Allen believed Plaintiff could stand. The nonexamining state agency consultants did, however, based on their review of the treatment records and Dr. Allen's examination. AR 68-69, 79-81.

Plaintiff argues that because the Social Security Administration ordered a consultative examination, the record is underdeveloped "and still in need of an examining opinion concerning [Plaintiff's] physical limitations." Doc. 11. Plaintiff relies on an unpublished case from this district in which Judge Roberts held the ALJ erred in considering the claimant's narcolepsy disorder under the listing for somatic disorders,

rather than the listing for seizure disorders, as guidance from the Social Security Administration instructed; and ordering a consultative examination with a neurologist but inadvertently sending the claimant to a neuropsychologist instead, then relying on that consultative examination even though the examiner stated she did "not specialize in diagnoses of narcolepsy" and could not "reliably weigh in on" on whether the claimant suffered narcolepsy and its effect on his cognitive abilities.[33] This case is inapposite.

The regulations provide that an ALJ may order a consultative examination for several reasons:

> We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:
> (1) The additional evidence needed is not contained in the records of your medical sources;
> (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
> (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or
> (4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.[34]

Thus, I have previously held that an ALJ does not necessarily "err[] in failing to obtain functional limitations from the consultative examiner," since consultative examinations serve several purposes and may be ordered for reasons other than obtaining functional-opinion evidence.[35] The Eighth Circuit has also recognized that a "consultative

[33] ***Colleen S. v. Bisignano***, No. 24-CV-18, Doc. 17 (N.D. Iowa June 24, 2025).

[34] **20 C.F.R. § 404.1519a(b)**.

[35] See ***Halverson v. Saul***, No. 18-CV-2075, 2019 WL 8112166, at *6-7 (N.D. Iowa Dec. 30, 2019), *report and recommendation adopted*, 2020 WL 491469 (Jan. 30, 2020) (clear error

examination" may "assist the ALJ in []assessing . . . RFC" with its observations of "restricted range of motion, . . . tenderness," and the like, even if the consultative examiner "fail[s] to comment on [the claimant's] functional limitations or work-related functioning."[36] Plaintiff here does not argue that a "critical issue [wa]s undeveloped" or that the medical records "do not give sufficient medical evidence to determine whether the claimant is disabled,"[37] instead suggesting the ALJ erred as a matter of law by ordering a consultative examination without obtaining functional restrictions from the consultative examiner. *See* Doc. 11 at 21-22. I recommend rejecting this argument.

Plaintiff argues that the ALJ erred in evaluating his subjective complaints, particularly his testimony that he could not stand for six hours a day due to pain in his back and left knee. AR 52-54. When evaluating a claimant's subjective complaints—including pain—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[38] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[39] The ALJ may not discredit the claimant's allegations based solely on the

---

review), *rev'd and remanded,* No. 20-1658, 2021 WL 4438527 (8th Cir. May 25, 2021) (reversing on Appointments Clause constitutional issue).

[36] ***Montgomery v. O'Malley***, 122 F.4th 1059, 1063 (8th Cir. 2024) (court ultimately noted the record contained a consultative examination containing functional limitations).

[37] ***Martise v. Astrue***, 641 F.3d 909, 926-27 (8th Cir. 2011) (quoting ***Johnson v. Astrue***, 627 F.3d 316, 320 (8th Cir. 2010)).

[38] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986). The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

[39] ***Black***, 143 F.3d at 386.

absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary,"[40] or "inconsistencies in the record as a whole."[41] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[42]

Plaintiff argues the ALJ erred by not specifically addressing Plaintiff's claimed standing limitations. As the Commissioner notes, Plaintiff did not complain about standing limitations in his June 2023 function report, and he worked a job throughout the relevant time period that required standing for five-hour shifts. *See* AR 52-54. In addition, when asked why he could not work full time, he did not point to standing issues. *See* AR 38. Plaintiff cites a Seventh Circuit case recognizing that even if the ALJ fails to specifically explain his conclusion about the claimant's ability to stand, the court may affirm, as long as the "the ALJ 'built an accurate and logical bridge from the evidence to her conclusion'" and "'say[s] enough to enable review of whether the ALJ considered the totality of a claimant's limitations.'"[43] Plaintiff cites cases in which courts reversed because the ALJ failed to explain not imposing greater RFC limitations *and* "the medical evidence support[ed the claimant's] subjective complaints."[44]

---

[40] ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002).

[41] ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).

[42] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

[43] ***Jarnutowski v. Kijakazi***, 48 F.4th 769, 774 (7th Cir. 2022) (cleaned up) (first quoting ***Spicher v. Berryhill***, 898 F.3d 754, 757 (7th Cir. 2018); then quoting ***Lothridge v. Saul***, 984 F.3d 1227, 1233 (7th Cir. 2021)).

[44] ***Id.*** at 775-76 (holding that ALJ erred in failing to specifically explain finding that claimant could lift fifty pounds, contrary to claimant's testimony, when the medical evidence reflected claimant consistently complained of foot pain and was prescribed narcotics, which supported her testimony; the ALJ used boilerplate language to discount the only medical opinion in the record addressing lifting and did not adequately explain why it was not entitled to controlling weight under the pre-2017 regulations; and the ALJ focused on claimant's improved walking ability after foot surgery (which said nothing about improvement in her lifting ability) and relied on activities of daily living that did not involve lifting fifty pounds and were not inconsistent with

Here, the ALJ summarized the treatment records (AR 19-22). As Plaintiff's helpful synopsis of the treatment notes show, he primarily focused on mental-health treatment during the relevant time period, although he did seek treatment for right shoulder pain from October 2022 to April 2023, obtaining cortisone injections and undergoing imaging and physical therapy. *See* Doc. 11 at 5-13. He was frequently observed to walk with a limp by NP Allen-Benitz, but nothing in the record beyond his testimony supports an inability to stand or walk for six hours a day. Here, the ALJ did not err in failing to specifically address Plaintiff's testimony that he could not stand for more than five hours in a workday. The ALJ's reasoning may be inferred from the lack of support in the record (including statements submitted by the Plaintiff and his girlfriend).

Finally, Plaintiff argues in two sentences that "his limited activities did not show an ability to deal with the stress of full-time competitive work without excessive absences or off-task or slow paced time" and that "[t]he ALJ's failure to evaluate daily activities" warrants remand. Doc. 11. It is unclear what "limited activities" Plaintiff refers to. The activities of daily living reflected in Plaintiff's function reports and the treatment records are largely normal, although the mental-health treatment records do support Plaintiff needed time at home to decompress after work from his CNA job (which caused

---

claimant's testimony and the doctor's lifting restrictions); *see* ***John L. v. O'Malley***, No. 23-cv-732, 2024 WL 991543, at *3-4 (D. Minn. Mar. 7, 2024) (holding that ALJ erred by finding migraine headaches nonsevere at step two, stating only that the migraines were "intractable and are without aura or status migrainosus" and controlled with medications with only one dosage increase during the relevant time period, when plaintiff cited treatment notes in the record "that documented the severity of his headaches and medication dosages differently," which the ALJ failed to discuss or consider when determining plaintiff's RFC); *see also* ***Lawrence v. Kijakazi***, No. 21-cv-00118, 2023 WL 11158982, at *1 (S.D. Iowa Mar. 28, 2023) (holding that ALJ erred by rejecting both medical opinions in the record that claimant could perform light work as of June 2018 when ALJ instead found claimant could perform medium work as of January 2020 "in the aftermath of [p]laintiff's surgeries and mental health treatment"; the court held the ALJ could not "reject[] all the medical opinions concerning a plaintiff's limitations," but the Eighth Circuit's recent decision in *Bonham* calls this holding into question).

strife with his girlfriend, and is consistent with her report of isolationist tendencies). As discussed in the preceding section, for the most part, it appears Plaintiff was able to get out of bed and make it to his part-time job, which involved simple tasks and was lower stress than his CNA job. Although Plaintiff has suffered multiple mental-health breakdowns requiring hospitalization (in 2015 related to substance abuse and in 2022 related to his breakup), the record does not reflect that Plaintiff is routinely "subject to erratic periods of breakdown," as in the cases relied upon by Plaintiff.[45]

Overall, here, I recommend finding that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints.

## *III. CONCLUSION*

I recommend **affirming** the Commissioner's decision and entering judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the

---

[45] ***Hutsell v. Massanari***, 259 F.3d 707, 709-10, 713-14 (8th Cir. 2001) (remanding for an award of benefits when "[t]he medical evidence uniformly indicates that the stress of any sustained work is more than [claimant] can handle" because they reflect "she is subject to erratic periods of breakdown" from her schizophrenia-based disorders and psychosis; although plaintiff had worked full time as a dishwasher, her employer tolerated unscheduled absences as needed, and since her last hospitalization, plaintiff had worked minimal hours part-time on an as-needed basis); *see also* ***Ross v. Apfel***, 218 F.3d 844, 849-50 (8th Cir. 2000) (remanding for an award of benefits when record supported that plaintiff was able to do household chores on "good days" three to four days a week but was "incapacitated by pain" and confined to bed "an average of two days a week"); ***Hogg v. Shalala***, 45 F.3d 276, 279 (8th Cir. 1995) (holding that ALJ improperly relied on claimant's ability to perform "light housework and visit[] with friends" when plaintiff had borderline intelligence, "no real work experience," and a vocational rehabilitation agency could not find "an employer . . . willing to employ her").

objections.[46] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[47]

**DATED** August 17, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[46] **Fed. R. Civ. P. 72**.

[47] *See* ***United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).